UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CAROL BRADEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:18-cv-00644** |
| | ) | **Judge Aleta A. Trauger** |
| WESCO DISTRIBUTION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

WESCO Distribution, Inc. ("WESCO") has filed a Motion for Summary Judgment
(Docket No. 20), to which Carol Braden has filed a Response (Docket No. 25), and WESCO has
filed a Reply (Docket No. 28). For the reasons set out herein, the motion will be granted.

## I. BACKGROUND

WESCO is an international supplier of electrical products. (Docket No. 27 ¶ 1.) WESCO
has four warehouses in Nashville, all of which are located in the same building. (*Id.* ¶ 2.) Braden,
who works for WESCO, was born on June 16, 1953. (*Id.* ¶ 6.) She served in the U.S. Army for
over twenty years before retiring in 1992. (Docket No. 29[1] ¶ 1.) After her military career, she
worked in healthcare and in customer service. (Docket No. 27 ¶¶ 80–81.) In 2012, Braden came
to WESCO as a temporary worker, handling "summary billing and integration involved with
WESCO's contract with TVA." (*Id.* ¶ 4.)

In 2013, WESCO hired Braden on a permanent basis. (*Id.* ¶ 5.) Braden was originally
hired as a Warehouse Associate for the warehouse known as "Branch 7861." The decision to hire
her was made by Branch 7861 Operations Manager Mark Ross. Braden is close friends with

---

[1] The court's reliance on this and other assertions from Braden's Statement of Additional Facts to which
WESCO has objected is explained in Section III.A of this Memorandum & Order.

Ross's wife. (*Id.* ¶¶ 7–9.) Braden reported to Ross, but the other Warehouse Associates in Branch 7861 reported to a Warehouse Manager. (*Id.* ¶ 11; Docket No. 23-1 at 46.) Eventually, Ross was promoted to District Operations Manager, and he was replaced as Branch Operations Manager by Austin Jameson. (Docket No. 27 ¶¶ 8, 10.) According to Braden, her title was changed to Warehouse Administrator in January of 2017.[2] (Docket No. 23-1 at 93.)

A few months later, Warehouse Manager Kim Craig left his position at WESCO, creating a vacancy. (Docket No. 27 ¶ 12.) Jameson sent a request to WESCO's corporate office to hire a replacement for the empty position, which WESCO approved. When WESCO's corporate office approves a request to fill a position, the position is posted on the website located at wesco.com/careers, as well as on monster.com. Other job websites then pull the listing from monster.com. (*Id.* ¶¶ 13–14.) WESCO's job description for Warehouse Manager includes the following job summary:

> Manages activities of at least one warehouse supervisor or 2 or more other warehouse employees to optimize service, productivity and quality and minimize expenses; direct, organize, check work and schedule, direct and control job assignments; ensure warehouse processes are clearly documented, the workplace is safe, employees receive appropriate training, and performance management issues are addressed promptly. In conjunction with Human Resources, has authority to hire, fire, discipline, promote, reassign, determine pay increases, or conduct performance management of employees.

(*Id.* ¶ 26.) The job description states that the job requires "strong communication and interpersonal skills," "ability to remain calm and resolve problems in a timely manner under stressful situations," and "ability to work in a team environment." (*Id.* ¶ 29.) It further states that the job requires at least 1–3 years of experience with "[s]upervision in [a] warehouse environment" and "[s]upervision with inventory control and cycle counting." (*Id.* ¶ 28.)

---

[2] WESCO does not dispute that she received the new title but disputes the date. (Docket No. 29 ¶ 22.)

WESCO's employee handbook has a section addressing the potential of making internal hires for new positions, under the section title "Internal Candidates":

> WESCO fosters a workplace where qualified employees are encourage[d] to seek various career opportunities, gain valuable work experience and increase job satisfaction. In general, notices of all regular, full and/or part time job openings are accessible through Employee Self Service in HR Connect, although WESCO reserves its discretionary right to not post a particular opening.
>
> Job posting is a way to inform employees of openings and to identify qualified and interested applicants who might not otherwise be known to the hiring manager. Eligibility requirements to apply for internal opportunities are outlined in WESCO's Internal Posting Policy which can be found on the Human Resources page of the Company's intranet site.

(*Id.* ¶ 15; Docket No. 23-4.) Braden concedes that the Warehouse Manager position was posted for both external and internal candidates. (Docket No. 27 ¶ 16.) She testified that she never sought out the job listing, and she concedes that she did not submit a formal written application. (*Id.* ¶ 18.) The parties agree, however, that Braden expressed interest in the position to supervisors. (*Id.* ¶ 22.) It is also undisputed that there was some internal discussion at WESCO about Braden's potential suitability for the position. On April 18, 2017, Ross sent an email to Jameson listing pros and cons of hiring Braden as the permanent Warehouse Manager. (*Id.* ¶ 31.) Among the cons was "Retiring in 2 years." (Docket No. 29 ¶ 25.) Braden's upcoming retirement was also, however, listed under the pros. (*See* Docket No. 25 at 7.) According to Ross, there would be both benefits and drawbacks to hiring a Warehouse Manager who would retire within two years. On one hand, the position would have to be filled again. On the other, the planned retirement would provide clarity with regard to transition planning and would allow a chance to train the manager's replacement. (Docket No. 20-3 ¶ 17.)

While the position remained open, WESCO named Braden and another employee who had expressed interest in the position, Steve Young, to be "co-acting Warehouse Managers."

(Docket No. 27 ¶¶ 21–22.) According to Braden, when Jameson appointed her to be one of the interim managers, she asked if she was under consideration for the permanent position. He replied that she was. (Docket No. 26-1 ¶ 5.) It is undisputed that, over the next two months, Braden "repeatedly asked if she [was] still under consideration and was repeatedly told that she was." (Docket No. 29 ¶ 5.)

In late June 2017, Jameson informed Young that WESCO did not believe Young was ready to be Warehouse Manager and that Young would not be continuing in the acting position. (Docket No. 27 ¶ 32.) Braden remained in her position, now as the sole acting Warehouse Manager. (*Id.* ¶ 34.) At the time that she learned she would be the sole acting manager, she again asked if she was under consideration for the permanent position. She was told that she was. (Docket No. 29 ¶ 6.)

Jameson was asked in his deposition whether Braden did a "good job" as acting Warehouse Manager, and he responded that she did a "fair job" but there were "lots of personnel issues when she was in charge." (Docket No. 23-2 at 46.) When pressed for details, he explained:

> I don't have anything written down but it was conversations where the staff would come to me periodically to [say] she chewed them out for no reason or they didn't think that her approach was fair and when I would look into the issue I would agree. . . .
>
> There was enough internal strife I believe between Carol and the rest of the full-time team that it—I don't know the right wording but it definitely influenced how I reviewed her progress.

(*Id.* at 47.) He stated that, "based primarily on independent, unsolicited feedback from the staff," he developed a "[l]argely negative" assessment of Braden's ability to manage people. That assessment, he said, was based on "her treatment of the staff, demeanor, abrasiveness, [and] overall personality." (*Id.* at 101.)

4

WESCO has produced a June 27, 2017 email from Jameson to a human resources employee in WESCO's corporate office, claiming that he had had a conversation with Braden about her need to "be more mindful of her attitude and demeanor when dealing with staff at all levels." (Docket No. 23-6.) Braden denies that Jameson discussed those issues with her on that date. (Docket No. 26-1 ¶ 8; Docket No. 27 ¶ 47.) In her Declaration, however, Braden states that, on that day, Jameson informed her that he had interviewed an applicant for the permanent Warehouse Manager position, and she again asked whether she was under consideration for the position herself. He assured her that she was. (Docket No. 26-1 ¶ 8.)

WESCO has produced a Declaration by Ross, in which Ross states that Braden's "behavior and demeanor clearly contributed" to "division in the warehouse" and "created a toxic environment." (Docket No. 23-3 ¶ 15.) He states that he originally believed that WESCO should hire Braden as a permanent Warehouse Manager, but her time as acting manager convinced him otherwise, "as she did not display the leadership or people management skills required." (*Id.* ¶ 12.) He claims that, "[w]hile serving as the interim Warehouse Manager, . . . Braden was very aggressive toward the other employees, displayed a quick temper, and often yelled at and talked down to her co-workers." (*Id.* ¶ 13.)

Braden testified that she is "very direct" and "honest to a fault," which has caused "some people [to] think [she is] too blunt." She testified that she has "tr[ied] to tone it down." (Docket No. 27 ¶¶ 35–36.) She testified that her coworkers at WESCO "think I'm a little too intense sometimes," but, she explained, "I'm a 'why person.' And you answer my question, I'm fine." (*Id.* ¶ 37.)

In her Declaration, Braden claims that much of the alleged strife that occurred while she was acting as manager was the result of complaints by Rachel Sedgwick, a WESCO employee

who was dating Braden's co-manager Young. Braden suggests that Sedgwick was undermining Braden in order to benefit Young. (Docket No. 26-1 ¶¶ 10–12.) In his testimony, however, Jameson acknowledged that Braden's interpersonal conflict with Sedgwick was "removed from the aspect of running and managing the warehouse." (Docket No. 23-2 at 47.) Jameson identified two employees, other than Sedgwick and Young, with whom there had been issues related to Braden, but Braden, in her Declaration, states that Jameson told her, at the time, that he "didn't really see any problem" with the situation between Braden and those other two employees. (Docket No. 26-1 ¶ 12.)

According to Jameson, between five and seven external candidates applied for the permanent Warehouse Manager position. (Docket No. 27 ¶ 19.) He testified that he conducted three in-person interviews and at least one phone interview with candidates, but Braden testified that he told her that he had only interviewed one candidate: Jeffrey Shelton, who ultimately received the job. (*Id.* ¶ 20; Docket No. 29 ¶ 20.) Shelton applied for the Warehouse Manager job by submitting a cover letter and résumé after seeing the position posted online. (Docket No. 27 ¶ 52.) Jameson and Ross interviewed Shelton in person on June 26, 2017, after which they agreed that he was their choice for the Warehouse Manager position. (*Id.* ¶¶ 53–54.) In his Declaration, Ross states that he and Jameson agreed that Shelton "was the most qualified candidate for the position." (Docket No. 23-3 ¶ 9.)

Shelton was born on September 8, 1967. (Docket No 27 ¶ 72.) He graduated from Central Methodist College in 1990, after which he served for ten years in the U.S. Army. (*Id.* ¶¶ 57–58.) While in the Army, he served as a logistics officer. (Docket No. 23-7 at 15–16.) According to Ross, that service included developing a "background in supply chain management." (Docket No. 23-3 ¶ 7.) According to the résumé on which WESCO relied, Shelton's last post, at Fort

Shafer in Hawaii, involved planning and managing supplies, services, maintenance, facilities, budget, and transportation for a 1,300-person division, as well as the reorganization of warehouses. (Docket No. 27 ¶ 61.) His résumé also states that, at different points during his service, he was in charge of a 161-person organization overseeing $6 million in assets, and he managed an 878,000-square foot warehouse with 2,300 lines of supplies valued at $11 million. (*Id.* ¶¶ 63–64.)

After the conclusion of his military service, Shelton worked for Kellogg Brown & Root ("KBR") as a logistics manager. As part of his position with KBR, Shelton "had direct reporting supervision over eight people and . . . was responsible for more than 200." (*Id.* ¶ 66.) After leaving KBR, Shelton worked briefly as a teacher. Braden points out that Shelton left each of those two jobs before completing his contracts, which WESCO does not dispute. (Docket No. 29 ¶ 29.)

From 2007 to 2016, Shelton worked for Chevron in Odessa, Texas, where he held positions including Supervisor, Operations Manager, and Project Manager. In 2016, he began working for Kasai North America in Manchester, Tennessee, in a position that he refers to as "Warehouse Manager and Inventory Control Supervisor" but which he has also described as "Inventory Manager." (Docket No. 23-8 at 1–2; Docket No. 27 ¶ 68.) According to Shelton, his responsibilities at Kasai involved overseeing receipt, storage, and issuance of inventory and making sure inventory was stocked at appropriate levels. He directly supervised six to seven employees over three shifts. (Docket No. 27 ¶¶ 69–70.) He resigned from his position at Kasai after just four months. He claims that his resignation was because he had been asked to handle company funds in an improper manner. (Docket No. 29 ¶ 31; Docket No. 29-2 at 30.) He did not

have a new position immediately lined up and was, therefore, unemployed for eight months before being hired at WESCO. (Docket No. 29 ¶ 32.)

Shelton's first day as Warehouse Manager at WESCO was July 17, 2017. (Docket No. 27 ¶ 71.) He supervises seven or eight employees, and he testified that he is responsible for shipping, receiving and sorting all materials that come inside the warehouse, as well as preparing weekly and monthly reports. (*Id.* ¶ 74.)

After Shelton was hired, Braden complained to WESCO's Human Resources Manager for its utilities division, Alex Huffman, about the fact that she was not hired for the position. Huffman reviewed the matter and told Braden that, if she had wanted to be considered for the position, she should have filed an internal application. (*Id.* ¶¶ 75–76.) Braden points out, however, that she did not participate in any formal application process before being promoted from Warehouse Associate to Warehouse Administrator. (Docket No. 29 ¶ 24.)

Braden admits that, when WESCO filled the Warehouse Manager position, she did not have the 1 to 3 years of experience with supervision in a warehouse environment that were, according to the job description, required. (Docket No. 27 ¶ 77.) She testified, however, that she supervised two particular employees "at times" while she was a Warehouse Associate. (Docket No. 23-1 at 78.) In her Declaration, Braden details significant responsibilities that were entrusted to her by WESCO, not just at the warehouse where she worked, but at "other Wesco warehouse operations around the country." For example, she states that she was "tasked with moving an entire warehouse, setting up a warehouse and getting backlogged warehouses up to date." (Docket No. 26-1 ¶ 4.) Braden testified that she was told that WESCO chose not to hire her for the permanent Warehouse Manager position in order to "calm things down." (Docket No. 23-1 at 74.) Braden points out that Jameson, who has worked at WESCO for thirteen years in five

different states, conceded that he was aware of no female Warehouse Managers at any of the locations where he worked, although he had had contact with one in another location. (Docket No. 29 ¶ 36.)

On July 13, 2018, Braden filed a Complaint in this court, alleging sex and age discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Tennessee Human Rights Act ("THRA"). (Docket No. 1.) On August 30, 2019, WESCO moved for summary judgment on all claims. (Docket No. 20.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Reliance on the Braden Declaration

Braden's Statement of Additional Material Facts was accompanied by supplemental documentation, including a short, twelve-paragraph Declaration by Braden addressing various issues related to her employment at WESCO and WESCO's denial of her promotion. (Docket No. 26-1.) The Declaration is signed by Braden and concludes with the phrase, "I declare and affirm under penalty of perjury and the laws of the United States that the foregoing is true and accurate." (*Id.* at 3.) Braden cites to the Declaration in support of some, but not all, of the additional facts she has asserted. In WESCO's Response to Plaintiff's Statement of Additional Material Facts, it responds to Braden's facts based on the Declaration by objecting that the Declaration does not comply with 28 U.S.C. § 1746. (Docket No. 29 ¶¶ 1–4, 7–9.) In its briefing, WESCO clarifies that its objection is based on the fact that Braden's Declaration is undated. (Docket No. 28 at 4 n.2.)

Even assuming that WESCO is correct that Braden has failed to comply with 28 U.S.C. § 1746, its argument that her technical noncompliance should preclude her from relying on the asserted facts is based on a now out-of-date understanding of Rule 56. Prior to 2010, Rule 56(e) specifically called on parties supporting or opposing summary judgment to rely on affidavits. *See* Fed. R. Civ. P 56(e) (2009). In 2010, however, the Rule was amended to adopt a more flexible standard focused on the admissibility of a fact at trial, not necessarily the form in which the fact

was presented at the time of the Rule 56 motion:

> As amended in 2010, Federal Rule of Civil Procedure 56 provides that parties asserting a genuinely disputed fact need only "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). It then permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Once an objection is properly made, the proponent must "show that the material is admissible as presented or . . . explain the admissible form that is anticipated."

*Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *see also* Jeffrey W. Stempel *et al.*, 11–56 Moore's Federal Practice—Civil § 56.91 (2018) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial."); Charles Alan Wright & Arthur R. Miller et al., 10A Fed. Prac. & Proc. Civ. § 2721 (4th ed.) ("The court and the parties have great flexibility with regard to the evidence that may be used in a Rule 56 proceeding."). Under this court's Local Rules, the "record," for Rule 56 purposes, includes all "documents filed in support of or in opposition to the motion or documents otherwise in the court file." L.R. 56.01(e). The court is therefore permitted to rely on Braden's Declaration, regardless of any technical noncompliance.

A party responding to a Statement of Undisputed Facts related to a motion for summary judgment must "respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed." L.R. 56.01(c), (d). If a party contends that a particular fact is disputed, then the party's assertion "must be supported by specific citation to the record." L.R. 56.01(c). WESCO has failed to comply with that rule with regard to several of Braden's assertions, choosing instead to rely solely on its objection related to

11

28 U.S.C. § 1746. Because that objection is not a sufficient basis for excluding a fact from consideration under Rule 56, the court will treat the relevant facts as undisputed for the purposes of WESCO's motion.

## B. Direct vs. Indirect Evidence

When defending against an employer's motion for summary judgment, an employee may prevail "by introducing either direct evidence that shows Defendant was motivated by discriminatory intent in treating Plaintiffs adversely, or by introducing indirect evidence that supports an inference of discrimination." *Brewer v. New Era, Inc.*, 564 F. App'x 834, 838 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566–67 (6th Cir. 2001)). When the employee relies on circumstantial evidence—the more common route, given that employers typically make at least some effort to conceal their discrimination—the court relies on the familiar burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). In contrast, if a plaintiff can establish discrimination solely with direct evidence, the *McDonnell Douglas* framework is unnecessary. The bar for direct evidence that would allow a plaintiff to bypass *McDonnell Douglas*, however, is high, typically requiring something akin to "the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).

Braden argues that she has produced direct evidence of age discrimination. Specifically, she relies on Ross's April 18, 2017 email in which he included, as one of the "cons" for not hiring Braden, that she would be retiring in two years. The Sixth Circuit has held, however, that

recognizing an employee's expected upcoming retirement date is "not the same as" discriminating on the basis of age and is, therefore, not necessarily direct evidence of discrimination. *Metz v. Titanium Metals Corp.*, 475 F. App'x 33, 34 (6th Cir. 2012).

In the context of Braden's case, in particular, there is a great deal of confounding evidence that prevents the "pros and cons" list from serving as direct evidence of discrimination. Braden's retirement was brought up by Ross, but Ross had originally *wanted* to promote her. The evidence showed that Jameson and Ross soured on Braden after the date of the email, in particular with regard to her performance as acting Warehouse Manager. Ross's mention of retirement may still be relevant as indirect evidence of discrimination or as evidence of pretext. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (considering retirement-related questions as part of the pretext inquiry). Ross's comment, however, is not such undeniable evidence of discrimination that the court can avoid the typical inquiry associated with indirect evidence.

## C. *Prima Facie* Case of Discrimination

Braden's ADEA and THRA age discrimination claims are analyzed according to the same general burden-shifting framework as discrimination claims under Title VII. *Policastro v. Nw. Airlines*, 297 F.3d 535, 538–39 (6th Cir. 2002); *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006). As applied in the context of the denial of a promotion, the *McDonnell Douglas* framework requires a plaintiff to show that

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). WESCO does not dispute that Braden can establish the first element. WESCO, however, disputes that she can

satisfy the second and fourth elements of the *prima facie* case, because she did not apply for the Warehouse Manager position, she was not qualified for the position, and the person who received the position, Shelton, was significantly more qualified than she was.

**1. Whether Braden Applied For the Warehouse Manager Position**

It is undisputed that Braden did not submit a formal written application for the Warehouse Manager position. The caselaw construing the application requirement, however, recognizes that employers are free to, and do, vary in their individual approaches to hiring and promotions and, therefore, "[i]n certain situations a formal application is not necessary in order to establish a prima facie case of discrimination." *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir. 1989). For example, "if the employer promotes employees into the positions in question without asking for applications or posting the opening so that employees could apply for the positions, then 'the application requirement of the prima facie case is loosened somewhat.'" *Id.* at 146.

In this case, WESCO did have a more formal application process that Braden did not avail herself of. She did, however, take the minimum step of "mak[ing] h[er] desire for the position known to the employer," *Id.* at 147, and was not told that she was required to do more. The court, moreover, cannot assume that Braden's belief that she had done all she needed to do was unreasonable. Reading the evidence in the light most favorable to her claims, she was placed in the position on an interim basis and repeatedly assured that she was under consideration for being hired permanently, without ever being admonished that she needed to make a more formal declaration that she was seeking the job or file a formal application for it. There is nothing categorically impermissible or implausible about an employer's allowing an internal candidate, particularly one already serving in a position on an interim basis, to rely on an oral expression of

14

interest in a job while other candidates are required to apply more formally. State and federal employment laws allow an employer wide discretion in how it wishes to handle its hiring and promoting processes; there is no rule stating that formal, written applications are the only ones recognized as valid. Indeed, the evidence shows that WESCO did offer some promotions (or at least changes in title) without a formal application process, such as Braden's promotion to Warehouse Administrator.

WESCO's position, taken to its logical endpoint, would mean that an employer could unambiguously assure an employee that she did not need to apply formally for a job and then rely on that lack of an application as a defense against her discrimination claim. Indeed, resolving all disputed facts and drawing all reasonable inferences in Braden's favor, that is arguably what happened here. While a jury might look at the evidence and conclude that Braden's informal conversations about the Warehouse Manager position did not amount to applying for it and that, therefore, her claims should fail, the court cannot resolve that reasonably disputable issue at the summary judgment stage.

### 2. Whether Braden was Qualified for the Warehouse Manager Position

Braden concedes that she did not have the requisite 1 to 3 years of experience with supervision in a warehouse environment mentioned in WESCO's job description of the Warehouse Manager position. She argues, however, that other evidence shows that she was qualified for the job regardless. She points out that WESCO considered her qualified to perform the job on an interim basis, despite her lack of supervisory experience, and Ross conceded that, at one point, he had believed that she was appropriate for the position—with his mind only being changed by her performance, not by his learning any new facts about her lack of experience. She also argues that, based on Shelton's résumé, his warehouse-specific experience was limited as

15

well, with much of his experience involving issues of logistics and inventory but not specifically the running of a warehouse. The fact that Shelton was hired, she argues, shows that the written requirements were flexible.

The Sixth Circuit has acknowledged that a court should not be "rigidly bound by the language in a job description" when determining "what qualifications are required for a particular position." *Browning v. Dep't of Army*, 436 F.3d 692, 696 (6th Cir. 2006) (quoting *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)). "[R]easonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions" but, instead, may consider any additional factors that they believe "would prove useful in performing the job." *Id.* (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1297 n.15 (D.C. Cir. 1998)). The fact that an applicant fell short of some written ostensible requirement therefore is not necessarily the end of the inquiry, if there is other evidence that the employer's true understanding of the qualifications for the job differed from the written description.

Although this is a close question, the court concludes that a reasonable juror could conclude that Braden was qualified for the Warehouse Manager position, based, in particular, on the fact that internal communications between her supervisors suggest that she was genuinely considered as a serious potential candidate, as well as the fact that, when she raised the issue, she was told that she was under consideration, rather than being told she did not meet the qualifications. Although Braden's management experience was limited, there is evidence sufficient to allow a reasonable juror to infer that WESCO was open to having a relatively novice manager—at least one they already knew and who already worked at WESCO—fill this position, which would allow Braden to satisfy this element of her *prima facie* case.

16

### 3. Whether Braden and Shelton were Comparably Qualified

The evidence that WESCO was willing to consider someone with Braden's limited management experience, however, does not change the fact that Shelton had considerably more management experience than she did. "[I]n order to satisfy the fourth prong of the *prima facie* burden in a failure to promote case, it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) (citations omitted). The Sixth Circuit has made clear that a plaintiff can fail to satisfy this prong, even if she succeeds in demonstrating that she possessed the minimum qualifications for the position. *Id.* at 244. Unlike Braden, Shelton had years of experience holding management-level positions and supervising others. While only some of his relevant experience was warehouse-related, the other experience involved matters of logistics and operations that WESCO could reasonably consider relevant to its decision.

Braden attempts to undermine Shelton's greater experience by pointing out aspects of his career path that a potential employer might take issue with—for example, that he left his jobs at KBR and Kasai abruptly and that he was unemployed when he applied to WESCO.[3] But the issue under the fourth prong is not whether Shelton's résumé was perfect, but whether his qualifications were sufficiently greater than Braden's that they could no longer be called

---

[3] Braden also points out that Shelton, who attained the rank of Captain, left the Army, at least in part, because he was subject to its "up or out" policy, "which requires that officers who have been twice passed over for promotion be removed from active status." *Haskell v. Sec'y of Army*, No. CIV. A. 93-1148 SS, 1993 WL 260690, at *1 (D.D.C. June 29, 1993). (Docket No. 29 ¶ 28.) In his deposition, Shelton noted that he was, at the time, dealing with an injury that rendered him non-deployable, which he contends was also a factor in the decision to end his military service. (*See* Docket No. 23-7 at 17.) Braden presented no basis for concluding that a former service member's having been subject to the "up or out" policy would negate his other qualifications for any civilian employment.

"similar." The undisputed facts show that Shelton came to WESCO with a lengthy history of serving in supervisory positions in relevant fields. Braden, in contrast, had little, if any, supervisory experience other than the experience she had developed while serving as acting manager at WESCO, and she came to the fields of supply chain management and inventory more recently than Shelton did. Because WESCO has shown that the candidate they selected was significantly more qualified than Braden, Braden cannot satisfy her prima facie case, and WESCO is entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, WESCO's Motion for Summary Judgment (Docket No. 20) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge